BENJAMIN F. SMITH & another *vs.* INHABITANTS OF
STOUGHTON.

Middlesex.    January 12, 1904. — March 31, 1904.

Present: KNOWLTON, C. J., LATHROP, BARKER, HAMMOND, & BRALEY, JJ.

*Municipal Corporations.    Waterworks.    Stoughton.*

Neither the water commissioners of a town as its agents, nor the town itself by a
vote, can make a binding contract on behalf of the town to take water from an
unauthorized source.

St. 1886, c. 240, created the Stoughton Water Company. By § 2 the corporation
was authorized to take the waters of Knowles' Brook.  By § 10 the town of
Stoughton was authorized to purchase the franchise, corporate property and
rights of the corporation.  This it did.  Thereafter the town made a contract
in writing for a supply of water from wells to be driven below the sources of
Knowles' Brook and independent of them.    *Held,* that the contract was not
binding on the town, because it provided for the construction of waterworks
in connection with a supply which the town had no legal authority to use.
*Stoughton* v. *Paul,* 173 Mass. 148, explained.

CONTRACT against the town of Stoughton for an alleged breach
of a contract in writing.    Writ dated May 19, 1899.

At the trial in the Superior Court before *Aiken,* J., the jury
returned a verdict for the plaintiffs in the sum of $14,126.53;
and the defendant alleged exceptions.

The contract sued upon was as follows:

" This indenture, made in duplicate, this twenty-fourth day of
November, 1897, by and between Benjamin F. Smith and Charles
G. Smith, both of Somerville, in the County of Middlesex, co-
partners doing business as B. F. Smith & Brother, party of the
first part, and the town of Stoughton through its board of water
commissioners, duly qualified and authorized by law to act in the
premises, party of the second part: — Witnesseth,

"1.  Said party of the first part, in consideration of the mutual
promises contained in this instrument, hereby agree to supply
the town of Stoughton, with a driven-well system of waterworks,
which will yield an average of one million or more gallons every
day of twenty-four hours.

" 2.  The proposed location of this system is on the Lincoln
Farm, so called, near the old dam, known as Pine Pond Dam,

near the head of Lincoln Pond, in the town of Stoughton, and in putting in the system, the suction main pipes shall not extend beyond the boundary line of said Lincoln Farm.

"3. The said party of the first part agrees to drive a sufficient number of either two and one-half inch or larger pipes, driven to a proper depth, using their own judgment as to the number, size and exact location of the wells to be made, in order to secure an average of one million gallons, or more, of water per day.

"4. Said party of the first part further agrees to do all the work, furnish all the material of every kind, and bear all the expenses of freight, transportation and for other purposes in connection with the putting in of said system, in the following manner and with the following specifications, to wit: —"

[Here followed the specifications.]

"11. After the party of the first part has driven and connected a sufficient number of wells, which in their judgment will yield an average of one million or more gallons of water per day of twenty-four hours, and shall have satisfied themselves, by pumping or other tests thereof, they shall then and thereafter pursue the work with all reasonable diligence.

"12. It is agreed that the final test shall be made after the new pumping station is built, and the pumps and boilers installed. Said final test shall be for a period not exceeding thirty successive days of twenty-four hours each. If at said final test, which shall be conducted under supervision of the party of the first part, and a representative of said town, and the fuel and one half the labor for which shall be furnished by said town, the yield of water of said system shall prove to be one million gallons or more per day of twenty-four hours, the town shall pay within ten days thereafter to the party of the first part the sum of twenty-eight thousand dollars ($28,000).

"13. Said party of the second part hereby agree that upon the performance of the agreement of said party of the first part, hereinbefore set forth, and within ten days from the final test aforesaid, to pay to the said party of the first part, the sum of twenty-eight thousand dollars ($28,000).

"14. The said party of the first part agrees that it will indemnify and save harmless the said town from all suits or actions, of every name and description, brought against the said town for

or on account of any injuries or damages received or sustained by any person or persons by or from the party of the first part, its servants or agents, in the construction of said work, or by or in consequence of any negligence in guarding the same, or any improper materials used in its construction, or by or on account of any act or omission of the said party of the first part or its agents, and to give to said party of the second part a bond in the penal sum of five thousand dollars to secure it upon this and their other agreements herein contained.

"15. The said party of the first part further agrees and guarantees that said system and plant shall during a period of one year from the commencement of said final test be capable of yielding an average of one million gallons of water or more per day of twenty-four hours, but this agreement and guarantee is upon the condition that they shall, in any failure to so yield, have and be given an ample opportunity to produce such yield by such additions to, or changes in said plant and system as shall to them seem necessary and advisable.

"In witness whereof the said Benjamin F. Smith and Charles G. Smith have hereto set their hands and seals, and the said town of Stoughton has signed and sealed these presents by Abram C. Paul, George F. Walker and George A. Wales, its board of water commissioners, hereto duly authorized this twenty-fourth day of November, one thousand eight hundred and ninety-seven."

[Here followed the signatures of the parties under seal as indicated in the foregoing paragraph.]

*T. E. Grover*, for the defendant.

*O. A. Marden*, for the plaintiffs.

KNOWLTON, C. J.    This is an action to recover damages for a refusal of the defendant to permit the plaintiffs to perform a contract in writing to put in certain wells and construct a system of waterworks for the defendant.    The primary question is, whether the contract relied on, in its application to the facts, and to the contemplated mode, and the only possible mode, of performing it, was one that the defendant had a legal right to make; or, to put it in another form, whether the contract was possible of performance by the plaintiffs, if the mode of performance was restricted to that which was within the legal rights of the defendant.

The only source for the supply of water from which the town was authorized to draw, at the place mentioned in the contract, was Knowles' Brook. The method prescribed by the contract was by driving wells, each consisting of a two and one half inch iron pipe, and connecting them together by pipes to which a pump was to be attached. These wells were twenty-five or thirty or more feet deep, and in boring them it appeared that, several feet below the surface, there was a stratum of fine sand, several feet in thickness, which was nearly but not entirely impervious to water. Below this stratum there was a body of loose coarse gravel, which, according to the contention of the plaintiffs, contained a large supply of water. The plaintiffs' witnesses testified that the water in this gravel came from a considerable distance, and being confined by this stratum, could not find its way, except in a very small degree, into the brook, and that the water gathered from the apparent watershed of Knowles' Brook was not a measure of the quantity that could be obtained from that locality. The water from all these wells flowed over their tops, and from one of them, when a covering was put on leaving a small orifice, the water spouted up five or more feet. The general contention of the plaintiffs was that there was an actual watershed of from three to six square miles, exclusive of the apparent watershed of Knowles' Brook, from which the water in this gravel was gathered, a large part of which could be reached by wells driven at the place prescribed in the contract. On the question whether it would have been possible for the plaintiffs to perform their contract, which called for a guaranteed supply of one million gallons of water per day throughout the entire year, the defendant objected to any evidence "that did not tend to show that the quantity of water called for . . . could be obtained from Knowles' Brook, or other sources from which the town was authorized to take water, or which would naturally find its way into said brook or such other sources, but the court overruled the defendant's objections, and the defendant excepted." The plaintiffs' recovery was had upon the theory that this contract authorized the taking of water which had no connection with Knowles' Brook, but which came underground in large quantities from long distances, and which, by reason of the subterranean geological formation, could be drawn to the surface

there by these wells. Knowles' Brook flowed through a part of
the farm owned by the defendant, on which the wells were to be
put, and it had its origin there; but the apparent watershed per-
taining to it was only about three quarters or seven eighths of a
square mile. The defendant's farm contained one hundred and
thirty-three acres, some portions of which were a long distance
from Knowles' Brook. The jury were instructed that, under the
contract, the plaintiffs might procure water anywhere within the
boundaries of the farm.

The Stoughton Water Company was organized under the St.
1886, c. 240, for the purpose of supplying the inhabitants of the
town of Stoughton with water. It was authorized to take water
by purchase or otherwise, from certain specified sources, one of
which was Knowles' Brook. It was important to private owners,
as well as to the public, that its rights, in reference to the sources
from which it might draw water, should be defined and limited.
Accordingly, its franchise gave it the rights mentioned and no
others. As a corporation it had no powers but those given by
its charter, and it could not take water and sell it to the inhab-
itants, either by purchasing lands and sinking wells, or otherwise,
except from the authorized sources. See *Bailey* v. *Woburn*, 126
Mass. 416, 418; *Forbell* v. *New York*, 164 N. Y. 522; *Bassett* v.
*Salisbury Manuf. Co.* 43 N. H. 569. If it had attempted to do
so, its act would have been *ultra vires*, and might have been pro-
hibited in the interests of the Commonwealth, or by a private
person who was injuriously affected by it. The defendant was
authorized by the statute to purchase the franchise and rights of
this corporation, and it exercised this authority. It succeeded
to the corporation's rights and no others. It is limited to the
same sources for its water supply as the corporation was. The
only source of supply to which this contract relates, that can be
used by the town, is Knowles' Brook.

As against ordinary corporations, there are equitable limita-
tions upon the defence of *ultra vires* to actions upon contracts
partly or wholly executed. See *Nims* v. *Mount Hermon Boys'
School*, 160 Mass. 177, and cases there cited. Whether this de-
fence could be availed of effectually in the present case, if the
town had not purchased the franchise and the original corpora-
tion were in the place of the present defendant, it is unnecessary

to decide. There are additional considerations affecting suits against towns; a contract not authorized by law is not binding upon a town or its taxpayers, and the courts will not enforce it. *Parsons* v. *Goshen*, 11 Pick. 396. *Minot* v. *West Roxbury*, 112 Mass. 1. *Lowell Five Cents Savings Bank* v. *Winchester*, 8 Allen, 109. *Allen* v. *Taunton*, 19 Pick. 485, 487. *Anthony* v. *Adams*, 1 Met. 284, 286. *Claflin* v. *Hopkinton*, 4 Gray, 502, 504. *Hood* v. *Mayor & Aldermen of Lynn*, 1 Allen, 103, 105. *Agawam National Bank* v. *South Hadley*, 128 Mass. 503, 505. *Lemon* v. *Newton*, 134 Mass. 476, 479. Neither the water commissioners as agents for the town, nor the town itself by a vote, could subject the taxpayers to a liability under a contract to take water from an unauthorized source.

The plaintiffs do not deny this proposition, but they rest their principal contention upon the decision in *Stoughton* v. *Paul*, 173 Mass. 148, which they treat as an adjudication conclusive in their favor in this case. We do not so consider it. That was a suit in equity to set aside the conveyance of the farm to the town, and this contract was introduced incidentally, as dependent for its validity upon the ownership of the farm. It was decided that the votes of the town did not limit the authority of the water commissioners. It was assumed, upon the record then before the court, that the purchase of the farm was with reference to taking and using the waters of Knowles' Brook. The single sentence, in the report of the finding, in reference to intercepting other subterranean waters as well as those flowing into Knowles' Brook, and the evidence on that subject, were not introduced as showing the principal object of the purchase. The purchase of the large tract was justified on the ground that it was thought necessary for the preservation and purity of the sources of water supply, and taking the waters of Knowles' Brook by interception and percolation was held to be permissible. In the opinion it is said that " The only question is whether the commissioners had authority to buy the land," and, from the beginning to the end of the opinion, it contains no reference to the contract now before the court. The validity of the present contract, in reference to the questions now raised, was not in issue, and a refusal of an injunction by a dismissal of the bill involved nothing as to the defences to the contract which might be set up in an action at

law afterwards. There was no jurisdiction in equity to enjoin proceedings under the contract on the grounds now relied on by the defendant. In reference to these matters the remedy at law was complete and adequate. Neither as a part of the substance of the suit then tried between the parties, nor collaterally, was there any adjudication of the questions now before the court. An adjudication as to the purchase of the land was not an adjudication as to this contract, subsequently made.

Because the contract was for the construction of waterworks in connection with a supply which the town had no legal authority to use, and because performance of the contract was impossible within limits legally permissible to the parties, the plaintiffs are not entitled to damages for the defendant's refusal to perform it.

*Exceptions sustained.*